**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**
**IN AND FOR SUSSEX COUNTY**

| | | |
|---|---|---|
| **RICHARD B. CAREY and** | ) | |
| **CAREY'S HOME** | ) | |
| **CONSTRUCTION, LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. S11C-10-029 MJB** |
| | ) | |
| **THE ESTATE OF DAVID L. MYERS** | ) | |
| **and ARLENE J. MYERS** | ) | |
| | ) | |
| **Defendants.** | ) | |

**Submitted:** April 15, 2015
**Decided:** July 1, 2015

### DECISION AFTER TRIAL

Tasha M. Stevens, Esq., Fuqua, Yori and Willard, 26 The Circle, P.O. Box 250, Georgetown, Delaware 19947, *Attorney for Plaintiff*

Dean A. Campbell, Esq., Law Office of Dean A. Campbell, LLC, 401 North Bedford Street, P.O. Box 568, Georgetown, Delaware 19947, *Attorney for Defendant*

**BRADY, J.**

## I. INTRODUCTION & BACKGROUND

This is a contract dispute between a general contractor and his clients. Contractor Richard B. Carey ("Carey") is the owner and sole member of Carey's Home Construction, LLC ("Carey's Construction," collectively, "Plaintiffs"). In 2008, Carey entered into a contract with David and Arlene Myers ("Mr. Myers" and "Mrs. Myers," collectively, "Defendants") to serve as general contractor on their custom home project. Mr. Myers has since passed away. At some point during the building process, the relationship between the parties deteriorated; Defendants ceased to make payments; and Carey stopped work.

Carey filed the instant action on October 31, 2011, alleging breach of contract and unjust enrichment. Specifically, Carey alleges that Defendants breached the contract by failing to pay the seventh installment and by failing to pay for extras that Defendants allegedly requested and Carey allegedly completed.[1] Carey further alleges unjust enrichment on the grounds that he performed extra work, that Defendants were aware of the extra work, and that Defendants knew they would be charged for the extra work.[2]

After the Court denied their Motion to Dismiss, Defendants filed an Answer and Counterclaim on April 20, 2012. Defendants deny that Carey performed his obligations in accordance with the contract.[3] Defendants deny that any "extra" work was performed and instead maintain that all of the work completed by Carey was work he was obligated to do under the original contract.[4] Defendants allege affirmative defenses, including that Carey breached the contract first "through non-performance and abandonment" and "by failing to

---

[1] Complaint, Item 1, at 1-2.
[2] Complaint, Item 1, at 2-3.
[3] Answer, Item 13, at 2.
[4] Answer, Item 13, at 3.

2

coordinate the job properly."[5]  Defendants further allege that Carey failed to disclose all of the subcontractors who performed work on the house and engaged in fraudulent billing for "extras" which were not authorized by signed change orders (when the contract stated that signed change orders were required).[6]

Defendants counterclaimed against Carey for breach of contract and negligent supervision for allegedly failing to coordinate and supervise his subcontractors, causing damage to the property; and for ultimately abandoning the project rather than correcting the damage.[7]  Specifically, Defendants allege that Carey permitted the hardwood floor and custom built cabinets to be installed before the HVAC system was installed and operational, resulting in damage to these fixtures caused by humidity.[8]  Defendants allege breach of the implied warranty of good quality and workmanship on the same grounds.[9]  Defendants allege consumer fraud for Carey's alleged failure to provide the change orders in writing, as per the contract, before performing extra or different work.[10]  Finally, Defendants allege that Carey deceptively used the fictitious name "Carey's Custom Home Construction," whereas the actual name of the business entity owned by Carey is "Carey's Home Construction," in violation of 6 *Del. C.* §3101.[11]  During trial, Defendants suggested that Carey also acted in bad faith to conceal the fact that his business is an LLC rather than a sole proprietorship.[12]

A three-day bench trial was held June 2-4, 2014.  Plaintiffs and Defendants submitted post-trial closing statements on June 27, 2014 and July 21, 2014, respectively.  The Court received a complete set of transcripts on April 15, 2015, and the Court took the matter under

[5] Answer, Item 12, at 3.
[6] Answer, Item 13, at 3-4.
[7] Answer, Item 13, at 5-6.
[8] Answer, Item 13, at 6.
[9] Answer, Item 13, at 6-7.
[10] Answer, Item 13, at 7.
[11] Answer, Item 13, at 8.
[12] Trial Transcript B at 150.

3

consideration. For the reasons detailed below, the Court finds that both parties breached the contract and owe damages to one-another. Offsetting the damages that Defendants owe to Plaintiff by the damages that Plaintiff owes to Defendants, the Court awards judgment to Plaintiff in the amount of $2,490.80.

## II. TESTIMONY AT TRIAL

### A. Carey's Testimony for the Plaintiff

Plaintiffs only called one witness at trial, Richard Carey. Carey testified that he has been a contractor in Sussex County for the past 25 years.[13] Carey testified that he has been in business for himself since 1997, originally as a sole proprietorship, which he later converted to an LLC for worker's compensation reasons.[14] Carey testified that the trade name of his business is Carey's Custom Home Construction, but when his accountant submitted the paperwork to create the LLC, the accountant left out the word 'custom.'[15] Hence, Carey testified, his LLC is named Carey's Home Construction, although Carey says that he was unaware that 'custom' had been omitted until he became involved in the present litigation.[16]

Carey testified that he was approached by Defendants sometime around 2007 about the possibility of Carey building a house for them.[17] Eventually, Defendants settled on a home in the Bridlewood development. Carey testified that when he asked Defendants what kind of house they were interested in, they indicated that they liked a home that Carey had built for another client, Kenny Hughes.[18] Carey said he told the defendants to contact the

---

[13] Trial Transcript A at 21.
[14] Trial Transcript A at 22-23.
[15] Trial Transcript A at 22.
[16] Trial Transcript A at 22, 24.
[17] Trial Transcript A at 28.
[18] Trial Transcript A at 28.

architect who designed Mr. Hughes' home, M.R. Designs.[19] Carey testified that Defendants came back to him after contacting M.R. Designs and told him that they did not get the plans because they thought the price was too expensive.[20] Carey said that he spoke with the architect and the architect agreed to provide an unmodified copy of the plans for Mr. Hughes' home at a lower price than it would have cost to draw up new plans or modify the Hughes plans.[21] These were the plans that Carey went on to use for Defendants' home. Carey testified that he gave the plans to Defendants, and that Defendants took the plans home to review them and make changes.[22] After Defendants had a chance to review the plans, the parties met to discuss the desired changes. The changes described by Carey include the house being "flip-flopped," meaning that the positions of the kitchen and dining room were switched with the master bedroom and bath.[23] Other changes included changing a screened-in porch into a closed-in room; dividing what was originally a sunroom into a closed-in room and a closet; and turning an office into a bedroom.[24] Carey testified that before construction began he had additional discussions with Defendants regarding what they wanted in the house and that some of the content of these conversations was memorialized in Carey's notes.[25]

Carey testified that he originally quoted Defendants $289,000 for the house they wanted.[26] Carey testified that Defendants told him that $289,000 was too high and indicated that they needed to get down to a certain number, but did not indicate what this number was.[27] Carey indicated several changes to which Defendants allegedly agreed for the purpose of

---

[19] Trial Transcript A at 28.
[20] Trial Transcript A at 28.
[21] Trial Transcript A at 29.
[22] Trial Transcript A at 33.
[23] Trial Transcript A at 34-37.
[24] Trial Transcript A at 34-37.
[25] Trial Transcript A at 38 (*citing* Carey's Notes, JX3).
[26] Trial Transcript A at 39.
[27] Trial Transcript A at 40.

lowering the price of the house, which Carey memorialized in his calculation notes.[28] The changes identified by Carey include: changing from a three-car garage to a two-car garage, subtracting the money that Carey allegedly saved by reusing the blueprints from the other home, adjusting the price to reflect the cheaper concrete driveway that the Defendants wanted rather than the blacktop reflected in the original estimate, switching from a composite deck to treated wood, and reducing the allowances for countertops, cabinets, and flooring.[29] Carey testified that the one thing that brought the price back up a bit was that Defendants requested a detached garage in addition to the attached garage.[30] The number that ultimately resulted was $246,000.[31]

Carey testified that after negotiating the changes and getting to price to one that Defendants would accept, he presented Defendants with a contract, which they took home and looked over for a few days before signing.[32] The contract included a "draw schedule" indicating the installments in which Defendants were to pay for the house.[33] Once the framing was up, Carey had Defendants come down to Delaware from their current home in New Jersey to inspect the layout.[34] Carey testified that he offered to make changes such as the locations of doorways at that point without extra charge since Defendants were supervising the project from a distance.[35] Carey said that Defendants took advantage of his offer and indicated that they wanted a couple doorways changed, which he did without

---

[28] Trial Transcript A at 40- 45 (*citing* Carey's Calculations. JX4).
[29] Trial Transcript A at 40- 46 (*citing* Carey's Calculations, JX4).
[30] Trial Transcript A at 44 (*citing* Carey's Calculations, JX4).
[31] Trial Transcript A at 47. Carey testified that the actual number was $244,384 but that he charged Defendants $246,000 to allow some leeway for incidental expenses.
[32] Trial Transcript A at 48-49.
[33] Trial Transcript A at 50.
[34] Trial Transcript A at 53.
[35] Trial Transcript A at 53.

charge.[36]  Carey testified that Defendants subsequently indicated other changes that they wanted made but that Carey did not prepare "change orders" for these items even though the contract indicated that change orders would be made for changes.[37]  Carey suggested that he did this in good faith—that he told Mr. Myers, "Well, a lot of contractors will charge you $50.00 just to make that change order.  I know what my contract says.  If you want to make the change, we'll just do time and material."[38]  Carey said that he simply kept track of the changes himself rather than bothering with formal change orders.[39]  The Court finds that Carey's choice not to execute formal change orders, while perhaps imprudent, was reasonable given that Defendants were living in New Jersey during the construction and the parties were orchestrating most of the job at a distance.  Carey testified that the changes requested by Defendants included adding "circle top" windows, extra concrete required for the driveway as a result of moving the house location, and adding windowed "sunburst" garage doors.[40]  Carey confirmed that his notes included a notation for $6,499.14 for a composite deck because, according to Carey, "[Defendants] still wanted the composite decking on their back deck even though [the parties] already took it off to get the price down on their house."[41]

Specifically regarding the deck, Carey confirmed that it was part of the contract between the parties, although not mentioned explicitly in the written contract, that the home should include a deck.[42]  Carey maintained that while Defendants originally wanted more expensive composite decking, the parties agreed to switch to treated lumber to get the price of

---

[36] Trial Transcript A at 54.
[37] Trial Transcript A at 56.
[38] Trial Transcript A at 56.
[39] Trial Transcript A at 57 (*citing* Extras, JX7).
[40] Trial Transcript A at 57-58.
[41] Trial Transcript A at 58.
[42] Trial Transcript A at 124; Contract, JX5.

7

the house down.[43] According to Carey, this change saved Defendants almost $10,000.[44] Carey testified that Defendants subsequently reneged on the agreement and demanded the composite deck, and that this was the reason the deck was not complete as of the time Carey left the job.[45]

Carey testified that during the "courting period" between him and Defendants, he remained very interested in getting the job.[46] Carey testified that in order to win Defendants over, he gave them several accommodations free of charge, including adding an "octagon bump," an area shaped like half an octagon with windows, to the house, which Carey estimated as worth over $8,000; putting 50 sheets of plywood in the attic to be used as flooring; and doing the concrete driveway himself and charging Defendants only for materials.[47] Carey testified that he absorbed $13,815.72 in order to get the job.[48]

Carey testified that at some point he told Defendants that they needed to address all the "extras" that they were requesting for the house.[49] Carey said that when Defendants acted like they did not know what "extras" he was talking about, he typed up a list and presented it to Defendants.[50] The total cost that Carey quoted for these extras was $8,440.90.[51] Carey said that he presented the list to Mr. Myers around March 2009, and Mr. Myers told Carey that he could not afford it.[52] In April, Carey received a letter from Defendants, stating that

---

[43] Trial Transcript A at 46.
[44] Trial Transcript A at 46.
[45] Trial Transcript A at 164. Carey testified that Mr. Myers expressly told him, "do not put that treated lumber on [the deck]."
[46] Trial Transcript A at 60.
[47] Trial Transcript A at 60-61.
[48] Trial Transcript A at 62.
[49] Trial Transcript A at 62.
[50] Trial Transcript A at 62 (*citing* Carey's Letter, JX8).
[51] Trial Transcript A at 63 (*citing* Carey's Letter, JX8).
[52] Trial Transcript A at 64.

they did not intend to pay for any of the extras.[53] Carey testified that after subsequent conversations with Defendants, they eventually agreed to pay roughly half of Carey's requested amount ($4,522).[54]

Regarding payments, Carey testified that Defendants paid the first, second, third, fourth, and fifth draws without incident.[55] After Carey presented Defendants with the list of extras, Defendants also paid him the sixth draw, which was, per the contract, triggered by the completion of the exterior of the house.[56] Regarding whether the exterior was in fact complete at the time Defendants paid the sixth draw, Carey conceded that certain items were incomplete, but he explained that he thought most of these incompletenesses were justified. First, Carey testified that the porch brickwork was incomplete but maintained that this was "extra" work, rather than work agreed upon under the original contract.[57] Second, Carey testified that the deck was unfinished but maintained that this was because Defendants stopped him from putting on the treated lumber boards.[58] Third, Carey testified that the decorative shutters were not installed, but he explained that he usually puts them on at the end because they are "not a big-ticket item."[59] Finally, Carey conceded that the gutters were not installed, but he did not explain why.[60]

Carey testified that the seventh draw was to be triggered by the completion of the interior trim.[61] Carey said that at the time the sixth draw was paid, the interior trim was

---

[53] Trial Transcript A at 64-65 (*citing* Myers Letter, JX9).
[54] Trial Transcript A at 67 (*citing* Extras Agreement, JX10).
[55] Trial Transcript A at 68 (*citing* Draw Log, JX11).
[56] Trial Transcript A at 69.
[57] Trial Transcript A at 69.
[58] Trial Transcript A at 70, 164.
[59] Trial Transcript A at 125.
[60] Trial Transcript A at 125.
[61] Trial Transcript A at 70.

already complete.[62] Carey testified that he requested the seventh draw and the $4,522 for the extras from Defendants, but that they told him that the exterior of the house was not complete and they could not give him any more money until it was finished.[63] Carey testified that he told Defendants in response that they had already received extras that they did not pay for and that he could not continue the work until he was paid.[64]

Carey testified that the relationship between him and Defendants changed after he presented them with the bill for the extras.[65] Carey said that up until that point, Defendants seemed satisfied with the job he was doing, but after they received the bill, Defendants became critical of his workmanship.[66] Carey said that he tried talking to Defendants, but they cited several things that they wanted him to do before they gave him any more money, including finishing the brick façade and installing composite decking on the deck.[67] Carey testified that he finally told Defendants that he would not be doing any more work until the seventh draw was tendered.[68] Carey testified that he did not receive payment, and he left the job.[69] Carey made a list of the items left incomplete at the time he left the job, including larger items such as the driveway, shutters, and water heater; and fixtures such as toilet seats, lights, and door knobs.[70] Carey said that he priced out the remaining work, and that the outside work remaining amounted to $8,175, and the inside work remaining amounted to $7,161.97.[71] Carey also took pictures of the state of the house when he left.[72]

---

[62] Trial Transcript A at 71.
[63] Trial Transcript A at 71.
[64] Trial Transcript A at 71.
[65] Trial Transcript A at 71.
[66] Trial Transcript A at 72 ("Up until that point, my workmanship was great. Everything looked great to that point. After that, it was all 'This is wrong here. This is off a little bit here.'").
[67] Trial Transcript A at 73.
[68] Trial Transcript A at 73.
[69] Trial Transcript A at 74.
[70] Trial Transcript A at 74 (*citing* List of Incomplete Items. JX12).
[71] Trial Transcript A at 75.

Regarding the installation of the custom kitchen cabinets, Carey testified that his only involvement was to be there to meet the cabinetmaker and to open the house up for him.[73] Carey testified that the installation of the cabinets was not a part of the contract and he had no obligation to supervise the cabinetmaker.[74]

**B. Mrs. Myers' Testimony**

Defendants presented five witnesses, including Carey. Defendants' first witness was Mrs. Myers. Mrs. Myers confirmed that Defendants met with Carey because they liked a house that Carey had built.[75] Mrs. Myers confirmed that Carey got the blueprints for the previous house from M.R. Designs to use for Defendants' home.[76] Mrs. Myers testified that some changes were made to customize the plans for Defendants and confirmed that Carey had described the changes fairly accurately.[77] When asked how these changes would affect the price, Mrs. Myers testified that Carey said that "it wouldn't be an issue" to move walls and doors while the framework was up.[78]

Mrs. Myers testified that the original proposal that Defendants received from Carey was $280,000, but that they asked Carey to try to bring the number down.[79] Mrs. Myers testified that Defendants did not want to go above their $250,000 budget.[80] Mrs. Myers said that Defendants had taken out a $250,000 home equity loan to cover the construction of their

---

[72] Trial Transcript A at 76.
[73] Trial Transcript A at 91.
[74] Trial Transcript A at 91.
[75] Trial Transcript B at 11.
[76] Trial Transcript B at 12.
[77] Trial Transcript B at 14.
[78] Trial Transcript B at 15.
[79] Trial Transcript B at 17.
[80] Trial Transcript B at 17.

11

new home, but that they did have funds to go above that amount if necessary.[81]  Mrs. Myers testified that she had no notice that Carey was operating as an LLC at the time the contract was made.[82]

Concerning the specifics of the project, Mrs. Myers disputed that the third garage bay was taken out of the plans to save money; Mrs. Myers maintained that it was always supposed to be a two-car attached garage along with a two-car detached garage.[83]  Mrs. Myers testified that her husband was going to trade Carey a car for the detached garage but this plan was never put in writing.[84]  Mrs. Myers confirmed that the driveway was to be made out of concrete.[85]  She said that she had no knowledge of the driveway being moved 24 feet, but conceded that this was probably something arranged for by her husband.[86]  Mrs. Myers testified that the cabinets and bathroom vanities were not included in the contract and that Defendants planned to take care of these themselves; but otherwise the home was supposed to be "turnkey."[87]  Mrs. Myers testified that the finished home was to include, among other things, a heating unit and central air conditioning unit.[88]  Concerning the front porch, Mrs. Myers testified that it was to be "all brick," meaning that the brick veneer would extend "[a]ll the way around the two windows" and onto the two side walls.[89]  Mrs. Myers testified that even though these areas were siding in the original plans, the brick porch was a change that was added in the contract.[90]

---

[81] Trial Transcript B at 20.
[82] Trial Transcript B at 16.
[83] Trial Transcript B at 17.
[84] Trial Transcript B at 18.
[85] Trial Transcript B at 20.
[86] Trial Transcript B at 21.
[87] Trial Transcript B at 22-23.
[88] Trial Transcript B at 23.
[89] Trial Transcript B at 24.
[90] Trial Transcript B at 25.

Concerning the payment draws, Mrs. Myers testified that Defendants never received written invoices.[91] Mrs. Myers testified that since Defendants were far away from the site, they often took Carey's word that the work was done.[92] Mrs. Myers testified that at some point after they had already paid the fourth draw, Defendants became aware that not everything they thought was done was in fact complete.[93] However, it was unclear from Mrs. Myers' testimony whether she believed that these items were required to be done for the fourth draw.[94] Mrs. Myers testified that at the time Defendants paid the fifth draw, which was for drywall, in March 2009, the drywall was not completed to Defendants' satisfaction because "[t]here were a lot of seams where you could see openings."[95] Mrs. Myers testified that the seams were eventually fixed.[96]

Mrs. Myers was asked whether Carey authorized Defendants to have the cabinets installed in April 2009. Mrs. Myers responded, "I guess he did, because we told him that Sam, [from] Hilltop Furniture was coming down, and that he needed to have the appliances there so that they would put the appliances in [because there were cabinets specially made for the appliances]."[97] Mrs. Myers testified that Carey did not make the appliances available as Defendants requested.[98] Mrs. Myers testified that prior to the issue concerning the appliances in April 2009, the only dispute between Defendants and Carey had been related to the deck—

---

[91] Trial Transcript B at 28.

[92] Trial Transcript B at 28.

[93] Trial Transcript B at 28-29.

[94] As examples of things that were not done, Mrs. Myers mentioned "roughing in" for the heating and air conditioning systems, the gas line for the furnace being hooked up, and the second bathroom being roughed in. The Court asked whether the gas line was part of the specs, to which defense counsel answered "no," but the witness did not clarify whether any of the other items were supposed to be finished before the fourth draw. Trial Transcript B at 29-30.

[95] Trial Transcript B at 33.

[96] Trial Transcript B at 34.

[97] Trial Transcript B at 31. On cross-examination, Mrs. Myers clarified that Defendants were the ones who actually arranged to have the cabinets installed. Trial Transcript B at 152.

[98] Trial Transcript B at 31-32.

when Defendants told Carey to stop construction on the deck because he was prepared to install treated lumber decking instead of the composite that Defendants wanted.[99]

Mrs. Myers testified that Defendants received the bill for the "extras" sometime in April or May 2009.[100] Concerning the list of items on the second page, Mrs. Myers testified that Defendants disputed several of them. First, Mrs. Myers testified that they disputed items 1-6 because these items all concerned the framing, and it was Defendants' understanding that changes to the framing would be done free of charge.[101] Concerning item 7, framing the medicine cabinet, Mrs. Myers testified that Defendants thought this was also included.[102] Concerning item 11, the circle top windows, Mrs. Myers testified that Defendants thought these were included because they were in the original plans for the house and are in Mr. Hughes' home on which Defendants' home was modeled.[103] Concerning items 12 and 14, the brickwork, Mrs. Myers said that Defendants disputed it because they did not know that the brick was oversized brick, which would be more expensive, and because they thought that the bricking the entire porch was included in the original contract price.[104] Concerning item 13, extra recessed lights, Mrs. Myers testified that Defendants disputed this charge because Carey had never specified the number of recessed lights to be included to begin with.[105] Despite these disagreements, Mrs. Myers confirmed that the parties eventually came to an agreement whereby Defendants would pay half of the amount that Carey had requested for the extras ($4,522).[106] However, Mrs. Myers said that her understanding was that this amount was not

---

[99] Trial Transcript B at 32.
[100] Trial Transcript B at 34 (*citing* Carey's Letter, JX8).
[101] Trial Transcript B at 37.
[102] Trial Transcript B at 37.
[103] Trial Transcript B at 38.
[104] Trial Transcript B at 38-39.
[105] Trial Transcript B at 40.
[106] Trial Transcript B at 42.

14

due to be paid until after the house was finished.[107] However, Mrs. Myers later testified that it was her impression that if the full $8,440 was not paid for the extras, work would cease.[108] It is unclear whether Mrs. Myers intended to indicate that her understanding changed at some point.

Mrs. Myers testified that Carey requested the sixth draw around the same time as he requested payment for the extras.[109] Draw 6 was for the completion of the exterior. Mrs. Myers testified that Defendants drove down over the weekend to inspect the house and found that certain exterior items were not completed, including the brickwork, deck, decorative shutters, gutters, and driveway.[110] Mrs. Myers said that Carey reassured Defendants that he would get these items done within two weeks and so Defendants sent him the money for the sixth draw.[111]

Mrs. Myers testified that Carey appeared to stop working on the house around May 15, 2009.[112] According to Mrs. Myers, on July 3, Defendants went down to inspect the house.[113] Mrs. Myers said that they found the brickwork incomplete on the outside of the home and also that the inside of the home was very humid as if it had been closed up and left unattended for a very long time.[114] Mrs. Myers testified that the cabinets and hardwood floor had warped due to the humidity.[115] Mrs. Myers said that Carey came one time and sanded down the floors, but this did not fix the problem and resulted in sand getting stuck to the walls

---

[107] Trial Transcript B at 42.
[108] Trial Transcript B at 43.
[109] Trial Transcript B at 44.
[110] Trial Transcript B at 44.
[111] Trial Transcript B at 45; Trial Transcript C at 19.
[112] Trial Transcript B at 47.
[113] Trial Transcript B at 48.
[114] Trial Transcript B at 48.
[115] Trial Transcript B at 48-50.

and ruining the paint finish.[116] Mrs. Myers testified that at this point Defendants became concerned that Carey was using their money on someone else's house and that very little work was done on their house over the summer.[117] Some brickwork was done over the summer, and the well was installed. However, Mrs. Myers testified that the Carey installed the wrong well pump.[118] Mrs. Myers testified that they spoke with Carey the week of August 17, 2009, and he asked them for the seventh draw check, which was for the interior work.[119] Mrs. Myers said that they refused because they did not consider the interior complete; in fact, in Mrs. Myers' opinion, "[Carey] didn't even finish the work for Draw 6 for the outside of the house and [Defendants] paid him for that."[120] Mrs. Myers said that Defendants went to the house on September 4, 2009 and at that point found all of Carey's equipment removed, which they interpreted to mean that he had abandoned the job.[121] Mrs. Myers said that Defendants obtained legal counsel and demanded that Carey provide "adequate assurance" that the job would be finished, but Carey demanded more money in order to finish the job.[122] Specifically, Carey requested the $30,000 seventh draw and that the final $16,000 draw be put into escrow.[123]

Mrs. Myers testified that Defendants subsequently hired various subcontractors to finish outstanding projects including plumbing work,[124] gutters and downspouts,[125] composite decking installation,[126] removing and reinstalling the brick veneering,[127] laying gravel in the

---

[116] Trial Transcript B at 51.
[117] Trial Transcript B at 52.
[118] Trial Transcript B at 52-53.
[119] Trial Transcript B at 54.
[120] Trial Transcript B at 54.
[121] Trial Transcript B at 56.
[122] Trial Transcript B at 56, 60.
[123] Trial Transcript B at 60 (*citing* Carey's Response, JX19).
[124] Trial Transcript B at 61-62 (*citing* Plumbing Receipts, JX24).
[125] Trial Transcript B at 64 (*citing* Gutter Proposal, JX26).
[126] Trial Transcript B at 65-66 (*citing* Millwork Invoices, JX27).

driveway, repainting the rooms,[128] refinishing the hardwood flooring,[129] installing carpets,[130] and installing insulation in the floor.[131] Mrs. Myers testified that Defendants also personally bought miscellaneous items (e.g., doorknobs and register covers) to finish the home from home improvement stores such as Home Depot and Lowes.[132] Mrs. Myers testified that during this time, Defendants uncovered other damages and deficiencies in the workmanship performed and overseen by Carey, including chips in the tub finish and faucets installed incorrectly.[133]

On cross-examination, Plaintiff's counsel questioned Mrs. Myers about her understanding of how Carey was able to get the cost of the house down from the initial bid of $289,000 to the contact price of $246,000.[134] Mrs. Myers testified she "didn't know" how the money was trimmed off.[135] Counsel asked Mrs. Myers, "You believed that you were going to get everything you wanted for the 289,000 for the price of 246,000?", and Mrs. Myers answered, "Yes."[136] Concerning the issue of the name of Carey's business and whether it was an LLC, Mrs. Myers testified that she wrote checks to Plaintiff in various names because she was unsure of the actual name of the company.[137] Mrs. Myers testified that she never asked whether Plaintiff was an LLC but that "it would have mattered" to her and her husband

---

[127] Trial Transcript B at 66 (*citing* Robert Donovan Invoice, JX28).
[128] Trial Transcript B at 68 (*citing* Jason Donovan Invoice, JX29; Receipts, JX30).
[129] Trial Transcript B at 69 (citing Receipts, JX30).
[130] Trial Transcript B at 70 (*citing* Ultimate Flooring Receipt, JX31).
[131] Trial Transcript B at 78-79 (*citing* Insulation Receipt, JX34).
[132] Trial Transcript B at 72 (*citing* HomeDepot/Lowes Receipts, JX32).
[133] Trial Transcript B at 63-64.
[134] Trial Transcript B at 145-46.
[135] Trial Transcript B at 146.
[136] Trial Transcript B at 146.
[137] Trial Transcript B at 150.

whether Plaintiff was a sole proprietor or an LLC.[138]  However, Mrs. Myers was unable to articulate precisely why the difference would be important.[139]

Mrs. Myers testified that Defendants requested some framing changes at the time of the first walk-though, and that Carey assured Defendants that these changes "wouldn't be a problem."[140]  Changes included changing the doorway to the master bath from a regular doorway to an arched doorway[141] and putting in fewer recessed lights in the kitchen than originally planned.[142]  Plaintiff's counsel asked Mrs. Myers about the April 3, 2009 letter that Defendants wrote to Carey, in which Defendants went through and responded to all of the items which Carey designated "extras" in the bill that he sent.[143]  Mrs. Myers testified that she wrote "nickel-and-dime" next to several items, indicating that Defendants thought that these were trivial expenses for which Carey should not ask them to pay.[144]

Relevant to the issue of whether Defendants knew Plaintiff was an LLC, Mrs. Myers confirmed that at the bottom of the bill that Carey sent for the "extras" there is a sentence: "Balance due on extra to Carey's Custom Home Construction, LLC," but said that she did not notice this at the time she originally received the bill.[145]  Mrs. Myers also confirmed that "Carey's Home Construction, LLC" is noted on the Change Order but testified that she did not notice this either.[146]

---

[138] Trial Transcript B at 150.
[139] Trial Transcript B at 150.  Mrs. Myers testified that the importance was due to the fact that "there [are] different things that go on, and that [one] can do with a LLC that you can't do as a self-employed person." When asked to specify what these things are, Mrs. Myers answered, "I don't know what they are specifically."
[140] Trial Transcript C at 5.
[141] Trial Transcript C at 7.
[142] Trial Transcript C at 10.
[143] Trial Transcript C at 13-14 (*citing* Carey's Letter, JX8; Myers Letter, JX9).
[144] Trial Transcript C at 13-14 (*citing* Myers Letter, JX9).
[145] Trial Transcript C at 14 (*citing* Carey's Letter, JX8).
[146] Trial Transcript C at 15.

## C. Defendants' Experts

*i. Patricia McDaniel*

Defendants called Patricia McDaniel ("McDaniel"), the owner of a general contracting business known as Boardwalk Builders.[147] McDaniel testified that she received a degree from the School of Architecture and Planning at MIT in 1980 and has been working in the construction field ever since.[148] McDaniel also holds various other professional certifications and professional memberships[149] and has published roughly ten articles in *The Journal of Light Construction*.[150] McDaniel testified that she is familiar with the Sussex County Building Code and has testified as an expert in Superior Court twice before.[151] Plaintiff's counsel had no objection to admitting McDaniel as an expert on construction, estimating of construction projects, and compliance with Sussex County Code.[152]

McDaniel testified that she was hired by Defendants to inspect the home and offer an opinion on the general contractor.[153] McDaniel opined that she found several problems with the construction of the home. These problems included (1) the doors not being flat to the doorjambs,[154] (2) the concrete driveway not yet being installed,[155] (3) the decorative shutters not yet being installed,[156] (4) the garage doors being uninsulated,[157] and (5) the framing in the attic not being to code.[158] McDaniel testified that either the ceiling joists should be installed

---

[147] Trial Transcript B at 84-85.
[148] Trial Transcript B at 86.
[149] Trial Transcript B at 86-88.
[150] Trial Transcript B at 89.
[151] Trial Transcript B at 90-91.
[152] Trial Transcript B at 91-92.
[153] Trial Transcript B at 93.
[154] Trial Transcript B at 98-100. McDaniel testified that it would cost $2,000 to fix this problem in Defendants' home.
[155] Trial Transcript B at 100-101. McDaniel testified that it would cost $12,000 to install the driveway.
[156] Trial Transcript B at 101-102. McDaniel testified that it would cost $1,800 to have the shutters installed.
[157] Trial Transcript B at 102-103. McDaniel testified that it would cost $400 to insulate the doors.
[158] Trial Transcript B at 104-106. McDaniel testified that it would cost $8,000 to fix the framing problem.

parallel with the rafters or an alternative "tying" procedure can be used, but neither appeared to have been used in Defendants' home.[159]

Plaintiff cross-examined McDaniel about the amount of time she spent inspecting the home, and McDaniel testified that it was about an hour and a half on the first visit and an hour on the second visit.[160] Plaintiff also questioned the applicability of some of the construction reference materials on which McDaniel relied given that they were from 20-30 years ago.[161] McDaniel testified that the relevant information has not changed.[162] Plaintiff asked whether the plans contained everything that McDaniel testified the code requires, the "tying" for the roof in particular.[163] McDaniel testified that the plans themselves are "vague as to how to accomplish the tying of the roof" and conceded that there are probably many ways to accomplish the tying.[164] Nonetheless, McDaniel testified that she personally observed the inside of the roof by climbing into the attic, although she did not specifically crawl out into the attic space under each of the four cross-gables.[165] McDaniel confirmed that at the time she prepared her written report there was some question in her mind as to whether the roof was properly tied.[166] However, McDaniel said that she confirmed it was not properly tied on her second visit.[167] Plaintiff's counsel also questioned McDaniel at length about how she arrived at her estimates for fixing the alleged problems with the home.[168] McDaniel testified that her estimates included a 30-40% markup for the contractor's overhead and profit.[169] On

---

[159] Trial Transcript B at 105-106.
[160] Trial Transcript B at 112.
[161] Trial Transcript B at 114.
[162] Trial Transcript B at 114.
[163] Trial Transcript B at 118.
[164] Trial Transcript B at 118-119.
[165] Trial Transcript B at 120.
[166] Trial Transcript B at 120.
[167] Trial Transcript B at 120, 127.
[168] Trial Transcript B at 121-26.
[169] Trial Transcript B at 122.

redirect examination, McDaniel acknowledged that she used a markup of approximately 35%.[170] On redirect, McDaniel confirmed that, in her professional opinion, a certificate of occupancy does not guarantee that the home is to code.[171]

*ii. Robert Donovan*

Defendants called Robert Donovan ("Donovan"), a retired masonry contractor.[172] Donovan testified that he was in business approximately 34 years and did brick veneering work for his entire career.[173] Donovan testified that in 2008-2009, he was in business and was hired by Defendants to revise the masonry work on the home in question.[174] Donovan said that he was initially called in, he believed, to finish the brick veneer work, but when he got there, Mr. Myers indicated that he wanted the existing brickwork removed because "the joints were too large" and because there were "light and dark spots" in the mortar.[175] Donovan testified that he told Mr. Myers that, given time, the sun would probably bleach the mortar and even out the color; and that he would probably see improvement within a year to a year and a half after the mortar was installed.[176] However, Donovan confirmed that he was not aware at the time he first saw the mortar that the work had already been sitting there for roughly a year.[177] Taking Mr. Myers' wishes into account, Donovan indicated that he presented a work proposal to Defendants, which included demolishing the existing brickwork,

---

[170] Trial Transcript B at 129. The Court thus assumes that McDaniel's figures include a 35% markup.
[171] Trial Transcript B at 131.
[172] Trial Transcript B at 132.
[173] Trial Transcript B at 133.
[174] Trial Transcript B at 134.
[175] Trial Transcript B at 135, 137.
[176] Trial Transcript B at 137-38.
[177] Trial Transcript B at 138.

removing the debris caused by the demolition, and installing new brick veneer, as well as constructing steps for the front porch.[178]

On cross-examination, Donovan testified that the mortar joints were large, but that "it was pretty uniform[,] and the work was true and straight."[179] Donovan testified that he did not evaluate the brickwork and recommend that it be torn out because "Mr. Myers had already made up his mind before [Donovan] showed up that the work was going to be torn out and he didn't like it."[180] Donovan testified that the acceptability of the mortar work was "a matter of opinion"; the joints were large, but Donovan had "seen a heck of a lot worse work."[181] Donovan testified that "from the road, it looked fine," but that "when you got up close, you could see the joints."[182] Donovan testified that the mason who did the work could have hid the larger joints if he "had simply used a smaller tool [or] tooled the joints with a smaller runner."[183] Donovan concluded that "there is a way to hide those joints…, if you had your act together."[184] Donovan confirmed that he would have been able to complete the brickwork, rather than removing the existing work and starting over, for about 50 percent less than what he charged Defendants.[185]

---

[178] Trial Transcript B at 135 (*citing* Robert Donovan Invoice, JX28).
[179] Trial Transcript B at 140.
[180] Trial Transcript B at 140.
[181] Trial Transcript B at 140-41.
[182] Trial Transcript B at 141.
[183] Trial Transcript B at 141.
[184] Trial Transcript B at 141.
[185] Trial Transcript B at 141.

*iii. Eric Korpon*

Defendants called Eric Korpon ("Korpon"), a licensed home inspector and the single member of Super Snooper, LLC, a home inspection company.[186] Korpon testified that he conducts home inspections using a framework called "the American Society [of] Home Inspectors Standards of Practice," which is "a five- or six-page statement of what you should look for and what you should observe and how you should report it," and which is adopted by the State of Delaware.[187] Based on the Standards of Practice, Korpon uses a two-page checklist that he goes through when he inspects a property.[188] Korpon described what he identified as deficiencies in the construction of the deck, including the fact that the deck was attached to the vinyl siding, rather than to the house itself.[189] Korpon testified that he observed evidence that the deck was moving away from the house due to the improper way it was connected.[190] Korpon testified that the construction of the deck was not in keeping with the best practices as outlined in the Deck Builder's Guide, a publication that is widely used in the industry.[191] Korpon also cited other deficiencies including the insufficient and improper use of joist hangers,[192] and the fact that the joists should overlap where they meet the support beam, rather than simply abutting each other.[193]

---

[186] Trial Transcript C at 57. Plaintiff's counsel requested voir dire, and the Court granted the request. Upon voir dire, Korpon clarified that he did not become a Delaware licensed home inspector until 2013 because Delaware did not regulate the home inspection trade prior to that date. Trial Transcript C at 63. Korpon confirmed that he was practicing under American Society of Home Inspectors ("ASHI") standards prior to 2012, but he could not confirm whether he became an ASHI-certified master inspector before or after he completed the home inspection in the instant case. Trial Transcript C at 64. Plaintiff's counsel was still hesitant to stipulate to Korpon's expertise, but the Court allowed the testimony, indicating that the Court is satisfied that by at least 2009, Korpon was sufficiently educated and experienced to be considered an expert. Trial Transcript C at 66.
[187] Trial Transcript C at 62.
[188] Trial Transcript C at 62.
[189] Trial Transcript C at 68.
[190] Trial Transcript C at 69.
[191] Trial Transcript C at 69.
[192] Trial Transcript C at 70-71.
[193] Trial Transcript C at 73.

Korpon testified that the brick veneering was roughly 80% complete when he inspected the home and that it only covered the porch area.[194] Korpon testified that he observed several deficiencies with the brickwork, including a gap between the siding and brick veneer, a lack of drainage holes, which are necessary to prevent water from building up behind the brick façade, discoloration in the mortar, and the large size of the joints.[195] Korpon testified that mortar color varied "[not] drastically, but observably," and that the defects were striking because the house was new construction, which he would not expect to exhibit such imperfections.[196] Korpon also testified that that there was no footing for the front porch steps.[197]

Korpon testified that the finish on the hardwood flooring "was rough and it was cupped in places."[198] He explained that the finish on the floor looked like it had not been sanded in between coats and that there was sawdust in the varnish itself.[199] Korpon testified that the cabinets were warped such that several of the cabinet doors did not close.[200] Korpon explained that this warping could be due to humidity.[201] Korpon testified that at the time he inspected the home the air conditioning system was installed, but the heating system was not.[202] He testified that it is usually risky to operate an air conditioning system when the temperature is lower than 65 degrees.[203] The upshot was that, at the time of Korpon's

---

[194] Trial Transcript C at 74.
[195] Trial Transcript C at 75-77.
[196] Trial Transcript C at 77-78. Korpon testified that if the house had been older, rather than new construction, this would have affected his assessment of the mortar defects. He explained, "It [i.e., had the house been old rather than new construction] would have made a difference in how I reported it. Because the existing house could have had repairs; it's got the history. It's like a used car, you know, a couple of scratches are expected. But a new house[,] you have a right to have it done all the same."
[197] Trial Transcript C at 81.
[198] Trial Transcript C at 79.
[199] Trial Transcript C at 79.
[200] Trial Transcript C at 80.
[201] Trial Transcript C at 80.
[202] Trial Transcript C at 84.
[203] Trial Transcript C at 84.

inspection in October, neither the heat nor the air conditioning could be run—the former because it was not installed and the latter because the temperature was too low.[204] Korpon also testified that at the time of his inspection the wrong size well pump was installed and that the crawl space was uninsulated.[205]

On cross-examination, Korpon confirmed that he did not have a copy of the contract at the time he conducted his home inspection.[206] Korpon testified that he had looked over the plans for the home but that he did not review them in detail.[207] Korpon testified that he does not consider himself qualified to evaluate plans as he is not an architect.[208] Korpon testified that while his inspection report noted numerous solid wood interior doors as not completely painted and appearing warped, he could not specifically identify which doors these were.[209] Korpon also confirmed that he only visually inspected the roof from the ground because it was raining on the day of the inspection and hence not safe for him to climb up on the roof.[210] Korpon noted that other items appeared unfinished, including loose wires hanging in the attic[211] and a wash sink not being installed.[212] However, Korpon admitted that he did not actually determine whether or not the loose wires were attached to anything in the house and that Defendants were the ones who told him that the wash sink should have been installed.[213]

---

[204] Trial Transcript C at 85.
[205] Trial Transcript C at 87-88.
[206] Trial Transcript C at 93.
[207] Trial Transcript C at 93-94.
[208] Trial Transcript C at 94.
[209] Trial Transcript C at 96.
[210] Trial Transcript C at 94.
[211] Trial Transcript C at 97
[212] Trial Transcript C at 98.
[213] Trial Transcript C at 97-98.

## D. Carey's Examination by the Defense

Defendants called Carey as their final witness. Carey confirmed that he did not complete the home or obtain the certificate of occupancy.[214] Carey testified that the air conditioning system became operational around the time when the cabinets were installed, but that the furnace was not installed at that time.[215] Carey testified that it was his decision to stop work on the project.[216] Carey testified that while he did not want to stop work, he felt that he had to because he was not getting paid.[217]

After Carey's examination by the Defense, Plaintiff recalled Carey to respond to a few points regarding the expert testimony in the case.[218] Carey testified that, contrary to Korpon's findings, he did not find any problems with the interior doors.[219] Carey also testified that the numbers quoted by McDaniel to finish projects such as the driveway and decorative shutters included a higher markup than he would use[220] and disputed the length of time the experts estimated to complete these projects.[221] Concerning the deck, Carey testified that some of the apparent deficiencies were due only to the fact that he was not finished with the deck yet.[222] Carey testified that he had originally installed an adequate footer for the porch steps but tore it out and replaced it because Defendants were not happy.[223]

---

[214] Trial Transcript C at 101.
[215] Trial Transcript C at 102.
[216] Trial Transcript C at 102.
[217] Trial Transcript C at 102-103.
[218] Trial Transcript C at 104.
[219] Trial Transcript C at 105.
[220] Trial Transcript C at 105-106.
[221] Trial Transcript C at 110
[222] Trial Transcript C at 111.
[223] Trial Transcript C at 113.

## III. POST-TRIAL CLOSING STATEMENTS

### A. Plaintiff's Statement

Plaintiff reiterates its contention that the parties' relationship deteriorated in April 2009 when Carey requested payment for the allegedly extra work.[224]  Plaintiff says that despite the disagreement about the extra work, Carey continued to work toward completion of the home.[225]  Plaintiff alleges that the parties came to an agreement in May 2009 under which Defendants would pay approximately half the amount that Plaintiff requested.[226]  Defendants subsequently paid the sixth draw, but did not pay the amount for the "extras."[227]  Plaintiff alleges that after around this time, "nothing Carey did was right" in the eyes of Defendants.[228]  Plaintiff says that Defendants unfairly blamed Carey for the scheduling of the cabinet installation and resulting damage, kept demanding extra work without offering additional payment, and threatened Plaintiff with litigation if Carey did not acquiesce to their demands.[229]

Plaintiff says that the breaking point was when Defendants refused to pay the seventh draw of $30,000 for completion of the exterior of the home.[230]  Plaintiff maintains that the house was "substantially complete" at the time the seventh draw was requested, requiring only "installation of exterior home fixtures (lights, gutters, and shutters), interior vent covers, appliances, carpet, a concrete driveway, three posts, three locks, crawlspace, toilets, a water heater, and the balance of a brick veneer."[231]  Plaintiff says that Defendants' refusal to pay the seventh draw left it with $20,000 in outstanding subcontractor bills and without the majority

---

[224] Plaintiff's Statement, Item 69, at 1.
[225] Plaintiff's Statement, Item 69, at 1.
[226] Plaintiff's Statement, Item 69, at 1.
[227] Plaintiff's Statement, Item 69, at 1.
[228] Plaintiff's Statement, Item 69, at 1.
[229] Plaintiff's Statement, Item 69, at 1-2.
[230] Plaintiff's Statement, Item 69, at 2.
[231] Plaintiff's Statement, Item 69, at 2.

of the expected profit.[232]   Plaintiff argues that Carey intended to finish the house, but Defendants wanted more than the contract required and were not willing to pay for the extras.[233]

*i. Breach of Contract*

Plaintiff maintains that Defendants breached the contract by failing to pay the seventh draw at Carey's request.[234]   Mrs. Myers testified that the seventh draw was not paid because the driveway, deck, brick veneer and steps were not complete; the outside fixtures and shutters were not installed; and the bathtub hardware installed incorrectly.[235]   However, says Plaintiff, only two of the items cited by Mrs. Myers are truly on the *exterior of the house*—the fixtures and the brick veneer.[236]   Plaintiff maintains that the driveway and the deck constitute "exterior work on the property," rather than exterior work on the house, and were not required to be complete for the sixth draw.[237]   Further, Plaintiff maintains that the deck was not complete because Defendants had changed their mind and wanted the more expensive composite decking, and the brick veneer was "an extra" because Defendants wanted it to cover a more extensive area than in the original plans and because it required special order jumbo brick.[238]

Plaintiff argues that even if the complaints cited by Defendants might have given rise to a claim for damages if not completed by the end of the job, they were not so significant as to justify the Defendants in withholding the seventh draw; "a slight breach by one party, while

---

[232] Plaintiff's Statement, Item 69, at 2.
[233] Plaintiff's Statement, Item 69, at 2.
[234] Plaintiff's Statement, Item 69, at 6.
[235] Plaintiff's Statement, Item 69, at 6.
[236] Plaintiff's Statement, Item 69, at 6.
[237] Plaintiff's Statement, Item 69, at 6.
[238] Plaintiff's Statement, Item 69, at 6.

giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract."[239]  Plaintiff argues that the incomplete items— the shutters and light fixtures not yet being installed, the brick veneer not being finished under the circumstances, and the hardware on the tub being improperly installed—simply did not rise to the level of material breach such as would justify breach by Defendants.[240]

## ii. Unjust Enrichment

Plaintiff argues that it is also entitled to payment for what it has identified as the "extras."[241]  It is Plaintiff's position that Defendants "wanted a more expensive home than they were willing to pay for" and were looking to get "Something for Nothing."[242]  Plaintiff concedes that Carey failed to provide Mr. Myers with change orders prior to the completion of most of the extra work.[243]  However, Plaintiff maintains that Carey discussed these changes with Mr. Myers and told him that they would be billed—based on costs for time and materials—at a later date.[244]  Plaintiff says that when Carey finally submitted a bill for the extras, he was met by anger and a refusal to pay from Defendants.[245]  Plaintiff says that the parties later entered into an agreement under which Defendants would pay roughly half of the requested amount for the extras, but Defendants subsequently reneged on this promise and decided that they did not have to pay for any of the extra work.[246]

---

[239] Plaintiff's Statement, Item 69, at 6 (*quoting BioLife Solutions v. Endocare*, 838 A.2d 268, 278 (Del. Ch. 2003)).
[240] Plaintiff's Statement, Item 69, at 6.
[241] Plaintiff's Statement, Item 69, at 7.
[242] Plaintiff's Statement, Item 69, at 7.
[243] Plaintiff's Statement, Item 69, at 7.
[244] Plaintiff's Statement, Item 69, at 7.
[245] Plaintiff's Statement, Item 69, at 7.
[246] Plaintiff's Statement, Item 69, at 7.

Plaintiff cites the trial testimony of Mrs. Myers as evidence of Defendants' unreasonable expectations and "Something for Nothing" attitude. For example, Mrs. Myers testified that "nothing" was changed or deleted from the original plans in order to get the price down by $43,000.[247] Plaintiff says that while Mrs. Myers insisted in her May 2009 letter that the circle top windows were included in the plans, she was forced to concede at trial that they were not.[248] Similarly, Plaintiff argues that Defendants' attitude of "entitlement" appears in the same May 2009 letter where Mrs. Myers identifies various items of extra work as "nickel and dime," which she testified meant that these items were of little expense and hence she did not think that she should have to pay for them.[249] Plaintiff argues that it should recover for extra work under the doctrine of *quantum meruit*, which requires the performing party to "establish that it performed services with an expectation that the receiving party would pay for them, and that the services were performed under circumstances that should have put the recipient on notice of the performing party's expectation of payment."[250]

*iii. Defendants' Counterclaims*

Plaintiff argues that Defendants' counterclaim for breach fails because Defendants materially breached first by withholding the seventh draw.[251] Plaintiff addresses Defendants' argument that Carey breached first by failing to provide adequate assurance of performance upon request in the September 9, 2009 letter and that this failure precludes Plaintiff's action for breach under 6 *Del. C.* §2-609.[252] Plaintiff argues that (1) 6 *Del. C.* §2-609 does not apply

---

[247] Plaintiff's Statement, Item 69, at 7.
[248] Plaintiff's Statement, Item 69, at 7 (*citing* Myers May 2009 letter, JX 15).
[249] Plaintiff's Statement, Item 69, at 7 (*citing Myers* May 2009 letter, JX 15).
[250] Plaintiff's Statement, Item 69, at 8 (*citing Olsen v. T.A. Tyre General Contractor*, 907 A.2d 146 (table), 2006 WL 2661140, *3 (Del. 2006)).
[251] Plaintiff's Statement, Item 69, at 8.
[252] Plaintiff's Statement, Item 69, at 8 (*citing* Hudson Letter, JX 18).

to the instant facts because it expressly applies to a contract for sale, but the instant contract is a contract for services, and (2) Carey did provide adequate assurance in his September 18, 2009 response letter, in which Carey indicated his willingness to perform the contract provided that the balance of the contract price was put into escrow.[253]

Concerning Defendants' counterclaims for negligent supervision and breach of the implied warranty of good quality and workmanship, Plaintiff similarly argues that Defendants have failed to meet their burden.[254] Concerning negligent supervision, Plaintiff says that Defendants would have had to prove: (1) Plaintiff has a duty to supervise and/or coordinate; (2) Plaintiff did not properly supervise and/or coordinate; and (3) Defendants suffered damages as a result.[255] Defendants' main claims concern to installation of the hardwood floors and the installation of the cabinets.[256] Regarding the flooring, Plaintiff argues that there was no testimony that the damage was caused by the lack of HVAC or by the failure of the wood to acclimate.[257] Regarding the cabinet installation, Plaintiff says that the installation was scheduled by Defendants and that they were aware that the HVAC was not installed at that time.[258]

Concerning Defendants' claim for breach of warranty of good quality and workmanship, Defendants have alleged that two items were not completed to Code and/or industry standards: the roofing and the brick veneer.[259] Plaintiff says that these allegations were based on a "very limited review of one area of the roof" by Defendants' expert,

---

[253] Plaintiff's Statement, Item 69, at 8-9 (*citing* Carey's Letter, JX 19).
[254] Plaintiff's Statement, Item 69, at 9.
[255] Plaintiff's Statement, Item 69, at 8.
[256] Plaintiff's Statement, Item 69, at 9.
[257] Plaintiff's Statement, Item 69, at 9.
[258] Plaintiff's Statement, Item 69, at 9-10. Further, Defendants are not seeking recovery for the damage to the cabinets.
[259] Plaintiff's Statement, Item 69, at 10.

McDaniel.[260]  In addition, Plaintiff maintains that McDaniel's estimates to fix the alleged problems included unreasonably high markups.[261]  Plaintiff cites Carey's testimony that he did install sufficient ties in the roof to satisfy the code requirements and that the home passed the county roofing inspection.[262]  Plaintiff says that Defendants did not present any testimony showing that the brick veneer fell below industry standards or needed to be replaced.[263]  Defendants' expert, Korpon, noted various cosmetic flaws in the brick veneer as well as the fact that it was incomplete.  Defendants' other expert, Donovan, testified that while the joints in the mortar were a little thick and there was some variance in mortar color, neither of these issues were serious enough to occasion removal of the existing veneer work.[264]  Donovan testified that he removed the existing work because Mr. Myers insisted that he did not like its cosmetic appearance.[265]

Finally, Plaintiff alleges that Defendants have failed to make a claim for fraud and misrepresentation because the original contract did not indicate that Plaintiff was an LLC.[266]  However, Plaintiff says that there was no evidence of malicious intent, intent to conceal the existence of the LLC, or to defraud Defendants.[267]  Plaintiff points out that the LLC was identified in later communications with Defendants when Carey presented change orders.[268]  Further, Mrs. Myers despite Defendants' position that the LLC issue was important, Mrs. Myers was unable to plausibly articulate why this was the case.[269]  The record shows that Defendants dealt with various LLCs during the construction of their home, and they did not

---

[260] Plaintiff's Statement, Item 69, at 10.
[261] Plaintiff's Statement, Item 69, at 10.
[262] Plaintiff's Statement, Item 69, at 10.
[263] Plaintiff's Statement, Item 69, at 10.
[264] Plaintiff's Statement, Item 69, at 10-11.
[265] Plaintiff's Statement, Item 69, at 11.
[266] Plaintiff's Statement, Item 69, at 11.
[267] Plaintiff's Statement, Item 69, at 11.
[268] Plaintiff's Statement, Item 69, at 11 (*citing* Carey's Letter, JX8).
[269] Plaintiff's Statement, Item 69, at 11.

indicate any reservations about these LLCs.[270]  Concerning fraud, Plaintiff says that

Defendants offered no evidence of false statements or representations that would amount to

fraud.[271]  Carey admitted that he failed to follow the contract by not preparing change orders

before additional work was completed.[272]  However, Plaintiff maintains that this does not

constitute a false statement or misrepresentation because Carey had conversations with Mr.

Myers in which Carey indicated that the extras would be billed at a later date and that the

charges would be for time and materials.[273]

Plaintiff asks for contract damages in the amount of $37,305.06, together with interest

and reasonable attorney's fees on its claims and asks that the Court find no liability on

Defendants' counterclaims.[274]


## B. Defendants' Statement

Defendants argue that there are two crucial facts that underscore why Plaintiff's claim

should fail and Defendants should prevail.  First, Defendants argue that the "vague and

ambiguous" contract is the source of every dispute that led to breach and that, as the contract

was drafted by Plaintiff, the contract should be construed against Plaintiff.[275]  Second,

Defendants argue that Carey's business was under-financed, leading Carey to violate the

Delaware Building Construction Payments Act, 6 *Del. C.* §3501 *et seq.*[276]  Defendants argue

that Carey should be held liable individually because he failed to disclose the agency

relationship and the identity of the principle; "[i]t is black letter agency law that an agent who

---

[270] Plaintiff's Statement, Item 69, at 11 (*citing* Gutter Proposal, JX26; Receipts, JX30; AquaTech Invoice, JX35).
[271] Plaintiff's Statement, Item 69, at 11.
[272] Plaintiff's Statement, Item 69, at 11.
[273] Plaintiff's Statement, Item 69, at 11.
[274] Plaintiff's Statement, Item 69, at 12.
[275] Defendants' Statement, Item 70, at 1-2 (*citing* Twin City Fire Ins. Co. v. Del. Racing Ass'n, 840 A.2d 624 (Del. 2003)).
[276] Defendants' Statement, Item 70, at 1.

transacts business on behalf of another is individually liable thereon of at time of entering into the transaction he fails to disclose his agency as well as the identity of his principal."[277]

Defendants present intertwined claims for breach of contract and fraud. At bottom, Defendants argue that Plaintiff and/or its agent Carey breached the contract by not completing work on time and not completing it to the proper standard of workmanship as well as by requesting extra payment for items that were supposed to be included in the original contract price. Defendants argue that the reason Carey requested more money and requested payment before the work that was supposed to trigger the payment was complete was that Carey mismanaged the business' money in violation of the Delaware Building Construction Payments Act.[278]

Under the Act, general contractors hold money or funds from the homeowner in trust for material providers, laborers, and subcontractors.[279] "No contractor, or agent of a contractor, shall pay out, use[,] or appropriate any moneys or funds… until they have first been applied to the payment of the full amount of all moneys due and owing by the contractor to all persons…"[280] Defendants ask the Court to recall Defense Exhibit #2.[281] Defendants point out that, prior to the deposit of the Defendants' first payment, the balance in Carey's operating account was only $532.77.[282] Defendants point out that immediately after their initial payment of $30,000 was deposited, Carey paid various personal expenses out of the account, including his electric bill, groceries, mortgage, and credit card.[283] By the end of the next day after the deposit was made, Carey had spent approximately $25,000 of Defendants

---

[277] Defendants' Statement, Item 70, at 2 (*citing Seaford Steel Products v. Tauber*, 1987 WL 18427 (Del. Super. Ct. Oct. 6, 1987)).
[278] Defendants' Statement, Item 70, at 3.
[279] Defendants' Statement, Item 70, at 3 (*citing* 6 *Del. C.* §3502).
[280] Defendants' Statement, Item 70, at 3 (*citing* 6 *Del. C.* §3503).
[281] Defendants' Statement, Item 70, at 3 (*citing* Checkbook Stubs, JX14).
[282] Defendants' Statement, Item 70, at 3 (*citing* Checkbook Stubs, JX14).
[283] Defendants' Statement, Item 70, at 3 (*citing* Checkbook Stubs, JX14).

money on things not related to Defendants' house.[284] Carey's only explanation at trial was that he keeps "crappy" business records.[285] Defendants argue that Carey needed to request the sixth draw early (and request money for "extras") because he had already claimed his overhead and profit ($25,000 worth) before construction even began and hence needed the additional funds to continue work on the house.[286]

Defendants argue that the contract explicitly states that Draw #6 was due when the exterior work was complete, but "[m]ost of the larger jobs associated with the exterior completion were not complete when Draw #6 was requested—and paid," including the driveway, deck, gutters, front porch brick veneer, front steps, and outside lighting fixtures.[287] Defendants claim that they paid Draw #6 before these items were complete because Carey refused to work otherwise.[288] Plaintiff argues that Defendants breached by failing to pay the seventh draw and the extras; however, Defendants maintain that Plaintiff breached long before the seventh draw was ever requested by (1) using approximately $25,000 of Defendants' money to pay personal expenses, (2) demanding the sixth draw before the exterior work was complete, (3) accepting the sixth draw payment but not finishing the exterior work as promised, and (4) billing Defendants for extras without executing change orders.[289]

Carey stated that he stopped work because the seventh draw was not paid, and Defendants admit that they did not pay the seventh draw.[290] However, Defendants argue that they were justified in not making payment when the work required by the sixth draw was still

---

[284] Defendants' Statement, Item 70, at 3 (*citing* Checkbook Stubs, JX14).
[285] Defendants' Statement, Item 70, at 4.
[286] Defendants' Statement, Item 70, at 4.
[287] Defendants' Statement, Item 70, at 5.
[288] Defendants' Statement, Item 70, at 5.
[289] Defendants' Statement, Item 70, at 6.
[290] Defendants' Statement, Item 70, at 6.

not complete.[291] Defendants explain, "[i]t's only logical that if a client has paid $30,000 for work that has not been completed, that that same client is not going to pay another $30,000 when that previous work has still not been completed."[292] Defendants argue that they did not have a "something for nothing" attitude and did not expect to get a $289,000 house for $246,000.[293] Defendants mention various concessions that they made to bring the price down, including taking responsibility for the cabinets, eliminating the single-car garage, and lowering the flooring allowance.[294]

Defendants argue that Plaintiff's *quantum meruit* argument for the alleged "extras" must fail because the contract clearly establishes the relationship of the parties.[295] "Delaware law is clear that quantum meruit is not available when an express contract establishes the relationship of the parties."[296] Defendants argue that Plaintiff has ignored the clear dictate of the contract: "Any alterations or changes from the specifications involving extra cost will be executed only upon written change orders, and will become an extra charge over and above the proposed price…"[297] Carey did not execute change orders for any of the extras claimed.[298]

Finally, Defendants assert an affirmative defense under 25 *Del. C.* §2705, which entitles an owner to request from a contractor a list of all persons who have provided labor or materials used on the property.[299] The statute states that a contractor who fails to provide the list within 10 days is not entitled to any further payments from the owner until the list is

---

[291] Defendants' Statement, Item 70, at 6.
[292] Defendants' Statement, Item 70, at 6.
[293] Defendants' Statement, Item 70, at 6.
[294] Defendants' Statement, Item 70, at 6.
[295] Defendants' Statement, Item 70, at 8.
[296] Defendants' Statement, Item 70, at 8 (*citing Daystar Sills v. Anchor Investments*, 2007 WL 1098129 (Del. Super. Ct. Apr. 12, 2007)).
[297] Defendants' Statement, Item 70, at 7.
[298] Defendants' Statement, Item 70, at 7.
[299] Defendants' Statement, Item 70, at 10.

furnished.[300] Defendants argue that the lists that Carey provided to Defendants upon request were incomplete and that Carey has yet to provide a comprehensive written list, hence Defendants do not owe any further payments.[301] Defendants state that Plaintiff's contention that 25 *Del. C.* §2705 is limited to mechanics' liens is incorrect.[302]

Concerning damages, Defendants argue that their counterclaim is based both on completion costs and remediation costs. In other words, Defendants argue that, having breached, Plaintiff is liable for the amount necessary to complete the house and bring the workmanship up to the level that Defendants reasonably expected.[303] Defendants provide an itemized list of fourteen items that Defendants allege are either incomplete, were completed defectively, or were completed by Defendants after Carey left the job.[304] These items include the driveway, the shutters, the deck, and the brick veneer on the front porch.[305] Further, with respect to items such as the driveway, which Carey claimed he could complete at less than the ordinary market price, Defendants argue that Plaintiff is liable for the cost of the job on the open market.[306] In total, Defendants argue that they are entitled to $21,599.08, together with costs of bringing the instant litigation, expert costs, "and such other relief as the Court may deem appropriate."[307]

---

[300] 25 *Del. C.* §2705.
[301] Defendants' Statement, Item 70, at 10.
[302] Defendants' Statement, Item 70, at 10.
[303] Defendants' Statement, Item 70, at 10.
[304] Defendants' Statement, Item 70, at 10-14.
[305] Defendants' Statement, Item 70, at 10-14.
[306] Defendants' Statement, Item 70, at 10.
[307] Defendants' Statement, Item 70, at 15.

## IV. STANDARD OF REVIEW

The Court is the finder of fact in a bench trial.[308]  The plaintiff must prove each element of a claim by a preponderance of the evidence, meaning that the Court shall find in favor of the party upon whose side "the greater weight of the evidence is found."[309]  Because the Court is the finder of fact, it is up to the Court to weigh the credibility of witnesses and resolve conflicts in witness testimony.[310]

## V. DISCUSSION

### A. Preliminary Issues

The major issue in this case is which party was the first to materially breach the contract.  However, before addressing this issue, the Court considers several secondary issues raised by the parties.

*i. Plaintiff's Unjust Enrichment Claim*

Plaintiff has claimed both breach of contract and unjust enrichment for the "extras" that Carey allegedly included in the home without being paid for them.[311]  It is well established in Delaware that "[g]enerally, *quantum meruit* is considered only if the relationship of the parties is not governed by an express contract."[312]  However, Delaware courts have recognized that a party may recover under a *quantum meruit* theory, even in the presence of an express contract, where the performing party establishes "that it performed

---

[308] *Pencader Associates, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del. Super. June 30, 2010).
[309] *Id.* (quoting *Pouls v. Windmill Estates, LLC,* 2010 WL 2348648, at *4 (Del. Super. June 10, 2010)).
[310] *Id.* at *3.
[311] Complaint, Item 1, at 2-3.
[312] *Daystar Sills*, 2007 WL 1098129 at *4.

services with an expectation that the receiving party would pay for them, and that the services were performed under circumstances which should have put the recipient on notice that the performing party expected to be paid by the recipient."[313]  Courts have specifically applied this principle to change orders.  In *R.E. Haight & Associates v. W.B. Venables & Sons*, the court held that the plaintiff's performance of work at the behest of the defendant, combined with the defendant's subsequent promise of payment, effectively waived the contract provision requiring a written change order, allowing the plaintiff to sustain a claim for quantum meruit.[314]

In the instant case, the parties dispute whether "extras" identified by Carey were in fact extras or whether they were supposed to be included in the original contract price. At trial, Mrs. Myers testified that big ticket items on the list of "extras" were supposed to be included in the original contract.[315]  These big ticket items included the circletop windows (which Mrs. Myers said were part of the original house plans) and "extra" porch brickwork (because Mrs. Myers said that the original agreement was for the entire porch to be bricked and Defendants were not previously informed that the bricks were "oversized").[316] Concerning less expensive items, such as framing out a medicine cabinet and adding extra receptacles in the kitchen and garage, Mrs. Myers testified that she considered these trivial "nickel and dime" expenses that the contractor ought to throw in.[317]  On the other hand, Carey testified that these items were all "extras" that Defendants requested subsequent to the contract.[318]  The Court finds the evidence in equipoise on the issue of whether these items

---

[313] *R.E. Haight & Associates v. W.B. Venables & Sons*, 1996 WL 658969, *4 (Del. Super. Ct. Oct. 30, 1996) (*citing Construction Systems Group v. Council of Sea Colony, Phase I*, 1995 WL 622421 (Del. Sept. 28, 1995)).
[314] *Haight & Associates*, 1996 WL 658969 at *4.
[315] Trial Transcript B at 37-44.
[316] Trial Transcript B at 38-39.
[317] Trial Transcript C at 13-14.
[318] Trial Transcript A at 62.

were included in the original contract or truly "extras" as Carey claims. Because the burden is on Plaintiff to prove its claim, the Court finds no damages for Plaintiff under the unjust enrichment theory. Nonetheless, it is undisputed that after Carey presented the bill, the parties subsequently agreed that Defendants would pay $4,522, roughly half of the requested amount.[319] The Court finds that the parties entered into an additional contract under which Defendants agreed to pay Plaintiff $4,522 for the alleged extras, and hence Defendants may be liable in this amount under a contract theory. The Court will consider this issue along with the main allegation of breach below.

*ii. Alleged Violation of Delaware Building Construction Payments Act*

Defendants have alleged that Carey engaged in misconduct with respect to the allocation of money that Defendants paid him to fund the construction in violation of 6 *Del. C.* §3501 *et seq.*[320] While Defendants presented evidence of Carey's alleged comingling of business and personal funds at trial, Defendants did not raise this specific allegation until trial.[321] This allegation does not appear in the Counterclaim and is not identified as among the issues of law in the Pretrial Stipulation.[322] For this reason, the Court will not consider this claim.

*iii. Fictitious Business Name and LLC Issue*

In the Counterclaim, Defendants argued that Plaintiff violated 6 *Del. C.* §3101 by deceptively using the fictitious name "Carey's Custom Home Construction" when the actual

---

[319] Trial Transcript A at 67 (*citing* Extras Agreement, JX10).
[320] Defendants' Statement, Item 70, at 1. There is a private right of action under 6 *Del. C.* §3507-3509. *See, e.g., Rays Plumbing & Heating Service v. Stover Homes,* 2010 WL 8250838, *2 (Del. Super. Ct. Dec. 15, 2010).
[321] Trial Transcript A at 123.
[322] Pretrial Stipulation, Item 62, at *4.

name of his business is "Carey's Home Construction."[323] Subsequent to their Counterclaim, Defendants have further alleged that they were unaware that the entity with which they were contracting was an LLC rather than a sole proprietorship and suggest that Carey acted in bad faith to hide the nature of his company.[324]

6 *Del. C.* §3101 requires a corporate entity doing business under a trade name to register its true corporate identity with the Prothonotary.[325] The penalties for violation of the statute are fines and/or imprisonment.[326] Delaware courts also found that failure to comply with the requirement may preclude the corporate entity from asserting certain rights in litigation.[327] However, there is no private right of action under 6 *Del. C.* §3101 itself; and violation of 6 *Del. C.* §3101 does not prevent a business entity from contracting,[328] nor does it deny the entity access to the courts.[329]

Defendants have not proven by a preponderance of the evidence that Carey acted in bad faith to conceal the nature of his business, that Defendants could not have easily discovered the nature of Carey's business if it were truly important to them, or that Defendants suffered any damages as a result of not knowing that Carey's business was an LLC. Carey testified that he began his business as a sole proprietorship, which he later

---

[323] Answer, Item 12, at 7-8.

[324] Trial Transcript B at 150.

[325] *King v. Miyata Bicycle of America*, 1993 WL 141065, *1 (Del. Super. Ct. Apr. 20, 1993).

[326] 6 *Del. C.* § 3106

[327] *King,* 1993 WL 141065 at *1. In *King*, the plaintiff attempted to ascertain the true identity of the defendant by contacting the Prothonotary. This effort failed because defendant had violated the statute by not registering its name with the Prothonotary. Relying on *Bechtel v. Robinson*, 886 F.2d 644 (3d Cir. 1989), the court held that the defendant was equitably estopped from asserting the statute of limitations as a defense. However, upon its Motion for Reargument, the defendant presented the court with photographs of the store with the business license, indicating the true corporate name, prominently displayed. The court reversed its holding on equitable estoppel finding that, unlike in Bechtel, the plaintiff had a straightforward means of discovering the true corporate identity—by going to the store and observing the posted license.

[328] *35 Virginia v. Tuttle*, 1987 WL 12897, *4 (Del. Ch. June 26, 1987).

[329] *Golden v. Bellevue Management*, 1986 WL 545143, *1 (Del. Com. Pl. June 6, 1986).

converted to an LLC for worker's compensation reasons.[330]  Carey testified that he did not believe that the difference between a sole proprietorship and an LLC was material with respect to the relationship with his customers; he explained, "I thought it was the same thing. I mean, me running the business one way or the other, I figured it was still me."[331]

Carey also testified that the trade of his business is Carey's Custom Home Construction; that he intended the LLC to have the same name, but his accountant left out the word "Custom" when he submitted the paperwork creating the LLC; and that he was unaware of the omission until he became involved in the instant litigation.[332]  The Court finds Carey's testimony credible.  Mrs. Myers confirmed that the business is in fact identified as an LLC on various documents, including the May 2009 bill for the alleged extras and a Change Order.[333] Mrs. Myers testified she did not notice the "LLC" designation on these documents, but the Court finds that the Defendants had at least constructive notice that they were dealing with an LLC.  Further, while Mrs. Myers testified at trial that "it would have mattered" to Defendants whether Plaintiff was a sole proprietorship or an LLC, she was unable to articulate why.[334] Since the inception of the instant litigation, Defendants have been unequivocally aware that Plaintiff is an LLC, and the Court finds that there has been no prejudice or other damages to Defendants from any previous confusion on this issue.

---

[330] Trial Transcript A at 22-23.
[331] Trial Transcript A at 169.
[332] Trial Transcript A at 22-24.
[333] Trial Transcript C at 13-14 (*citing* Change Order and Bill, JX8).
[334] Trial Transcript B at 150.

*iv. Consumer Fraud*

Defendants have alleged that Plaintiff engaged in "consumer fraud" by failing to prepare and present change orders to Defendants for the alleged extras.[335] The contract specifically provides, "Any alterations or changes from the specifations [*sic*] involving extra cost[s] will be executed only upon written orders."[336] To sustain a claim of common law fraud, a party must allege: (1) a false representation, usually one of fact; (2) the other party's knowledge that the representation was false or reckless indifference to the truth; (3) an intent to induce the injured party to act or refrain from acting; (4) the injured party acted or refrained from acting in justifiable reliance; and (5) resulting damages.[337] Delaware law also provides a cause of action under the Consumer Fraud Act, 6 *Del. C.* § 2511 *et seq.*, which differs from traditional legal and equitable actions for fraud in three ways: Under the Consumer Fraud Act, (1) a negligent misrepresentation is sufficient to violate the statute;[338] (2) the plaintiff need not demonstrate actual reliance; and (3) the plaintiff need not prove the defendant's intent to induce action/refraining from action.[339]

In the instant case, despite using the term "consumer fraud," Defendants have not specifically addressed or proven the elements of either common law fraud or consumer fraud under 6 *Del. C.* § 2511 *et seq.* Defendants have not proven that Plaintiff, negligently or otherwise, made a false representation—that Plaintiff did not fully intend to execute change orders for any modifications to the construction plans. Carey suggested in his trial testimony that when changes came up during the construction process, he just kept track of them himself

---

[335] Answer, Item 13, at *7.
[336] Contract, JX5.
[337] *Commonwealth Construction v. Cornerstone Fellowship Baptist Church*, 2006 WL 2567916, *25 (Del. Super. Ct. Aug. 31, 2006).
[338] However, in the case of an omission or concealment, the defendant must have intended that others rely on the omission or concealment. *Stephenson v. Capano Development*, 462 A.2d 1069, 1074 (Del. 1983).
[339] *Id.*

instead of executing formal change orders because it was more convenient and as a favor to Defendants because contractors usually charge for change orders.[340]

The Court finds Carey's testimony credible that the representation in the contract was not false because there is no evidence that Carey did not intend to comply with the change order provision at the time the contract was made. The Court accepts Carey's representation that he subsequently failed to comply with the change order provision out of convenience. While this may have been sloppy business practice, it is not evidence of fraud. While Defendants have not made a claim for fraud, the Court will consider Carey's failure to comply with the change order provision as part of Defendants' counterclaim for breach of contract, addressed below.

*v. Affirmative Defense under 25 Del. C. §2705*

Defendants have argued an affirmative defense under 25 *Del. C.* §2705. Section 2705 appears within the Delaware mechanics' lien statute, 25 *Del. C.* §2701 *et seq*. The purpose of Section 2705 "is to permit an owner to learn the identity of the persons who may obtain mechanics' liens on the owner's property, and if the contractor does not supply the owner with a list of persons who may obtain mechanics' liens, then the contractor 'shall not avail himself of any provisions' of the mechanic's lien statute."[341] The Court finds that 25 *Del. C.* §2705 is not applicable to the instant case as no mechanics' lien was filed.[342]

---

[340] Trial Transcript A at 56.
[341] *Rockland Builders v. Endowment Management*, 2006 WL 2053418, *3 (Del. Super. Ct. July 10, 2006).
[342] Trial Transcript A at 167.

## B. Breach of Contract

"A party is excused from performance under a contract if the other party is in material breach thereof."[343] Conversely, a slight breach by one party, while giving rise to an action for damages, does not terminate the obligations of the injured party under the contract.[344] Failure to perform by the injured party after a non-material breach constitutes breach of contract by the injured party.[345] It is well settled that, "[t]he party first guilty of a material breach cannot complain if the other party subsequently refuses to perform."[346] Material breach acts as a termination of the contract going forward, abrogating any further obligations to perform by the non-breaching party.[347] The non-materially breaching party may still, however, be liable for damages for its own non-material breaches prior to the terminal, material breach.[348]

The question of whether a breach rises to the level of materiality "is one of degree" and is determined by "weighing the consequences in light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.[349] The court will weigh factors including, (1) the extent to which the injured party will be deprived of a reasonably expected benefit; (2) the extent to which the injured party can be reasonably compensated for any such loss; (3) the extent to which the party failing to perform will suffer forfeiture; (4) the likelihood that the party failing to perform will cure his failure, taking into account all of the circumstances including any reasonable assurances; and (5) the extent to

---

[343] *BioLife Solutions v. Endocare*, 838 A.2d 268, 278 (Del. Ch. 2003).

[344] *Id.*

[345] *Id.*

[346] *Preferred Investment Services v. T & H Bail Bonds*, 2013 WL 3934992, *11 (Del. Ch. July 24, 2013).

[347] *Id.* at *17 (*holding* that the defendant was excused from performance going forward after the plaintiff's material breach).

[348] *Id.* at *21 ("A party who first commits a material breach of a contract cannot enforce the contract going forward. A non-breaching party, however, is not entitled to a windfall. The party in breach is entitled to restitution for any benefit that he has conferred by way of part performance") (internal quotation, citation omitted).

[349] *Id.* (*quoting Eastern and Heating v. Pike Creek Professional Center*, 1987 WL 9610, *4 (Del. Super. Ct. Apr. 7, 1987) (citations omitted)).

45

which the behavior of the party failing to perform comports with the standards of good faith and fair dealing.[350]

*i. Prior to the Termination of the Contract by Plaintiff, Neither Party's Breach was Excused by Prior Material Breach by the Other Party*

The parties in the instant case have both alleged breach against one another and have both argued that the respective breaches are excused by the other party breaching first. The Court finds that until Carey walked off the job, both parties had not fully complied with the contract, but the breaches were minor and the parties were continuing to work within the relationship created by the contract to address their disagreements.

The relevant events are largely undisputed: Around May 2009, Carey presented Defendants with the bill for the alleged extras. The parties subsequently agreed that Defendants would pay $4,522.[351] Also around this time, Plaintiff requested the sixth draw. Per the contract, the sixth draw was due "when exterior of house [was] complete."[352]

At the time the sixth draw was requested, certain items outside the house were not complete, including the driveway, brick veneer on the porch, deck, decorative shutters, and gutters. Defendants maintain that all of these items are located on the outside of the house and hence their not being complete means that the exterior of the house was not complete.[353] Plaintiff has argued that only the items that were to be *physically attached* to the exterior of the house counted for the sixth draw.[354] According to Plaintiff, the driveway and deck are not

---

[350] *Id.* (*citing Restatement (Second) of Contracts* §241 (1981)).
[351] Extras Agreement, JX10.
[352] Contract, JX5.
[353] Trial Transcript B at 44.
[354] Plaintiff's Statement, Item 69, at 6.

46

part of the exterior of the house itself but rather are exterior work on the property.[355] Carey also testified that work remaining on the brick veneer was "extra" because the brickwork was to be more extensive than originally planned under the contract.[356] Nonetheless, even putting aside the brick veneer, deck, and driveway, Plaintiff concedes that decorative shutters and gutters were not complete at the time Carey requested the sixth draw.[357] Mrs. Myers testified that Defendants paid the sixth draw after Carey assured them that that the outstanding exterior items would be completed within two weeks.[358]

Carey requested the seventh draw around August 2009. Per the contract, the seventh draw was due "when interior trim [was] installed."[359] Carey testified that not only was the interior trim completely installed by the time he requested the seventh draw, but it was actually complete as of the time he requested the sixth draw.[360] However, Mrs. Myers testified that not only were interior items left unfinished, but much of what was done was done with poor workmanship.[361] Carey testified that Defendants refused to pay the seventh draw, citing as the reason that the exterior (which was covered by the sixth draw) was still not complete.[362] Carey testified that his response was to point out that he still had not been paid for the "extras" for which Defendants has agreed to give him $4,522.[363] Carey confirmed that when Defendants failed to tender either the $4,522 or the seventh draw he left the job without completing it.[364]

---

[355] Plaintiff's Statement, Item 69, at 6.
[356] Trial Transcript A at 69.
[357] Trial Transcript A at 70.
[358] Trial Transcript B at 45; Trial Transcript C at 19.
[359] Contract, JX5.
[360] Trial Transcript A at 70.
[361] Trial Transcript B at 48-54.
[362] Trial Transcript A at 70.
[363] Trial Transcript A at 71.
[364] Trial Transcript A at 74.

The Court finds that Plaintiff breached the contract first by not completing all of the exterior items prior to the sixth draw. Even if the Court adopts Plaintiff's position that some of the incomplete items (e.g., the driveway and deck) should not be counted as part of the exterior of the house, it is undisputed that other items (e.g., the shutters and gutters) that were part of the exterior were incomplete. However, looking to the *Restatement* factors for determining the materiality of breach, the Court finds that this breach was not material and did not give rise to any significant damages.[365] Defendants have presented no evidence that they had reason at the time to doubt that Carey did not fully intend to complete the outstanding items within a reasonable timeframe. Mrs. Myers specifically testified that Carey reassured them that these items would be done within two weeks, and that this reassurance was the impetus for Defendants tendering the sixth draw.[366]

The Court finds that Defendants subsequently breached by (a) not paying the $4,522 they had agreed to pay for the alleged "extras," and (b) not paying the seventh draw when the interior trim was largely complete. Mrs. Myers testified that there were three reasons why Defendants withheld these two payments: (1) the exterior work, which was paid for by the sixth draw, was still incomplete; (2) there was damage to the interior finishes due to Carey's delay in getting the HVAC up and running; and (3) Defendants suspected that Carey had stopped work and was using their money on someone else's house.[367]

Regarding the first reason, the Court has already determined that this was not a material breach. Regarding the second reason, the Court determines that while it is more likely than not that there were defects with Carey's job performance, these defects did not rise to the level of material breach. Defendants alleged that the hardwood floors and cabinets

---

[365] *See Restatement (Second) of Contracts* §241 (1981).
[366] Trial Transcript B at 45; Trial Transcript at 19.
[367] Trial Transcript B at 48-50.

warped because Carey installed them before the HVAC system was up and running and because Carey left the house closed up during the summer.[368] Defendants have not claimed damages for the cabinets. Mrs. Myers testified that Carey attempted to fix the warping of the floors, at Defendants' request, although Mrs. Myers testified that this only made the problem worse.[369] Nonetheless, the Court finds that Carey's attempt to cure the alleged problem demonstrates that Plaintiff was still working within the agreement created by the parties. Regarding the third reason, the Court does not accept Mrs. Myers contention that Defendants reasonably believed that Carey had stopped work or that he was using Defendants' money on another job. Defendants have provided no support for these contentions other than Mrs. Myers' testimony that Carey appeared to stop working around May 15, 2009 and that when Defendants inspected the home on July 3, 2009, it appeared that the house had been closed up for a long time.[370] Further, Mrs. Myers' testimony that Carey had stopped work as of May 15, 2009 is inconsistent with her subsequent testimony that work was done on the house over the summer, including the installation of the well pump.[371]

While Defendants breached by failing to pay the seventh draw and the extra $4,522, the Court finds that this breach did not rise to the level of materiality such as to excuse Plaintiff's subsequent breach by walking off the job. Carey testified that when he requested these monies, Defendants told him that the exterior of the house was not complete and that they could not give him any more money until it was finished.[372] While Carey has disputed whether some of unfinished items on the outside of the house were covered by the sixth draw (e.g., the driveway and the deck), he confirmed that other items (e.g., the shutters and the

---

[368] Trial Transcript B at 48-50.
[369] Trial Transcript B at 51.
[370] Trial Transcript B at 47-48.
[371] Trial Transcript B at 52-53.
[372] Trial Transcript A at 71.

gutters) were not complete when they were supposed to be, which was at the time of the sixth draw.[373] It is notable that, from Carey's own account of events, Defendants did not simply refuse to pay but suggested that their willingness to pay was conditioned on Carey's finishing the exterior work, which should have been completed at the time of the previous draw. It appears to the Court that Carey had a reasonable path forward if he wanted to collect the seventh draw—that is, to make a good faith effort to complete the outstanding exterior items.

Carey's subsequent abandonment of the job constituted a material breach, which excused subsequent performance by Defendants. Rather than attempting to work things out with Defendants, Carey left the job and gave no indication that he would return to finish the outstanding work. The Court finds that the breach was not in good faith since Carey acknowledged that Defendants were withholding the seventh draw because Carey had not yet completed the items due under the sixth draw. Instead of attempting to remedy the problem, Carey decided that he was finished with the project.

*ii. Summary of Breaches and Damages*

The Court finds that both parties breached the contract and neither party's breach was excused by prior material breaches by the other party prior to Carey's abandonment of the project. Defendants breached by failing to pay the seventh draw ($30,000) and the $4,522 that they had agreed to pay for the alleged extras. Thus, the Court finds Defendants liable to Plaintiff in the amount of $34,522. However, this amount must be offset by the damages resulting from Plaintiff's own breach. Defendants are not liable for the final draw ($16,000) as Carey materially breached by walking off the job and not completing the construction.

---

[373] Trial Transcript at 70.

The Court finds that in addition to walking off the job, Plaintiff breached by failing to complete the exterior work as of the time of the sixth draw and because his workmanship fell below the reasonable standards of quality construction. The Court accepts the testimony of Defendants experts McDaniel, Donovan, and Korpon, concerning the defects with Plaintiff's workmanship.[374] Defendants presented credible testimony from McDaniel concerning inadequacy of the attic framing.[375] Plaintiff did not directly refute this testimony and presented no contrary experts or evidence, photographic or otherwise. Instead, the testimony offered by Plaintiff on the issue was vague. Plaintiff stated that he does what is required by the plans but he did not recall what was required on Defendants' home.[376] The Court finds that the attic framing was inadequate, accepts McDaniel's estimate, and awards damages to Defendants in the amount of $8,000).[377]

Carey admitted that the decorative shutters and gutters, which were part of the exterior of the house, were not completed at the time of the sixth draw.[378] The Court finds Defendants entitled to the amounts for completion of these items. Defendants have presented evidence of the actual amount ($850) that they paid to have the gutters completed, and the Court awards this amount as damages.[379] Regarding the shutters, McDaniel testified that it would take $1,800 to complete the job.[380] Carey testified that he would charge roughly $450 in materials plus $25 per hour for installation, and that installation would take approximately 20 per set for

---

[374] Under the category of "Plaintiff's workmanship," the Court includes both work completed directly by Plaintiff and/or work completed by laborers or subcontractors employed by Plaintiff. Hence, the Court considers together Defendants' claims both for poor workmanship and negligent supervision.

[375] Trial Transcript B at 104-108.

[376] Trial Transcript C at 110.

[377] McDaniel testified that her estimates include a 30-40% markup. Trial Transcript B at 122. She later agreed with counsel characterization of her markup as generally 35%. Trial Transcript B at 129. Carey testified that he would not use this high a markup to do the attic work proposed by McDaniel, but he did not indicate what would be an appropriate markup in his opinion. Trial Transcript C at 110-111. For this reason, the Court accepts the expert testimony of McDaniel.

[378] Trial Transcript A at 70.

[379] Gutter Proposal, JX26.

[380] Trial Transcript B at 101-102.

each of the ten sets.[381]  Hence, the labor cost would be $25 x 3.33 hours = $83.25.  However, Carey did not clarify if he would add an additional markup for profit and overhead, or what the additional markup would be.  Because Carey's testimony is unclear on the amount he would charge for the shutters, the Court adopts McDaniel's estimate and awards Defendants $1,800 in damages for the shutters.

Plaintiff has argued that the driveway was not part of the exterior of the house and hence was not covered by the sixth draw.[382]  The Court finds the contract ambiguous on this point.  The contract states only, "$30,000 due when exterior of house complete"; it does not define what is included as "exterior."[383]  In keeping with the well-established principle that an ambiguous contract is to be construed against its drafter,[384] the Court finds that the driveway was included in the exterior work and should have been complete as of the sixth draw.  McDaniel estimated $12,000 to complete the driveway, which included a markup of between 25-40%.[385]  Carey testified that a markup of 10-15% would be standard in the industry in Sussex County.[386]  The Court finds that McDaniel more likely than not that McDaniel's driveway estimate included her standard 35% markup.  The Court accepts Carey's testimony that this markup is high and awards Defendants the estimated cost to complete the driveway with a 15% markup, which is $10,221.20.

Similarly, the Court accepts Defendants' contention that the deck was also part of the exterior work that should have been completed in the sixth draw.  However, the Court also accepts Carey's testimony that the parties contracted for a treated lumber deck and that the

---

[381] Trial Transcript C at 107-108 (*citing* List of Incomplete Items, JX12).
[382] Plaintiff's Statement, Item 69, at 6.
[383] Contract, JX5.
[384] *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624 (Del. 2003).
[385] Trial Transcript B at 101-102.  McDaniel testified generally that she uses a 30-40% markup for jobs completed by her.  However, as the driveway would be completed by a subcontractor, there was some question as to whether McDaniel was using a lower markup in the driveway estimate.  *See* Trial Transcript C at 105.
[386] Trial Transcript C at 106.

reason the deck was not completed as of the sixth draw was that Mr. Myers told Carey not to install the lumber decking.[387] Defendants have alleged that they spent a total of $10,574.35 to complete the deck, $8,224.35 of which was for materials.[388] Concerning the labor, Defendants have submitted a cashed check written to another contractor with a note that says "deck + paint."[389] The Court finds that Defendants are not entitled to materials because they refused the treated lumber, which was what they had agreed to under the contract. The Court finds that Defendants are entitled to some credit for the labor to finish the deck, as this was covered by the sixth draw. For this reason, the Court awards Defendants a credit towards the cost of labor for completion of the deck in the amount of $2,000.[390]

The Court finds credible McDaniel's testimony that interior doors were warped and needed to be removed and reinstalled so as to fit and close properly.[391] As there was no contrary testimony on the amount necessary to fix the doors, the Court accepts McDaniel's estimate of $2,000 and awards Defendants this amount. The Court also finds credible Defendants' claims for repairing damages to the tub and tile;[392] painting touch-up and completion;[393] hardwood floor repair, and installing the correct water pump.[394] The Court awards Defendants their undisputed claimed amounts of $200, $1,650, $2,665, and $400, respectively.

Regarding the brick veneer, the Court accepts the testimony of Defendants' expert, Robert Donovan, who testified that while the brickwork was not aesthetically ideal, it was

---

[387] Trial Transcript A at 164.
[388] Defendants' Statement, Item 70, at 12.
[389] Receipts, JX30.
[390] The amount in the cashed check to the contractor is $2,350. However, as the note on the check says "deck + paint," the Court discounts this number to reflect the fact that Defendants are not entitled to any additional painting costs.
[391] Trial Transcript B at 97-100.
[392] Tile Receipt, JX25.
[393] Receipts, JX30.
[394] Trial Transcript B at 53-53; AquaTech Invoice, JX35.

adequate.[395] The Court accepts Donovan's estimation that the brickwork could have been completed, rather than torn out and redone, for approximately 50% less.[396] The implied warranty of good quality and workmanship in a construction contract only requires that the work shall be done "in a skillful and workmanlike manner"; it does not entitle the customer to excellence.[397] The Court awards Defendants $2,245 for the completion of the brickwork. Thus, the Court finds Plaintiff liable to Defendants in the following amounts:

| | |
|---|---|
| Attic Framing: | $8,000 |
| Decorative Shutters: | $1,800 |
| Doors not Flush: | $2,000 |
| Driveway: | $10,221.20 |
| Gutters: | $850 |
| Repairs to Tub & Tile: | $200 |
| Brick Veneer: | $2,245 |
| Painting: | $1,650 |
| Hardwood Floor Repair: | $2,665 |
| Water Pump: | $400 |
| Deck Completion: | $2,000 |
| **Total:** | $32,031.20 |

---

[395] Trial Transcript B at 141.
[396] Trial Transcript B at 141.
[397] *Casale Construction v. Best Stucco*, 2014 WL 1316150, *4 (Del. Super. Ct. Mar. 28, 2014).

Although it was discussed extensively at trial, Defendants have not claimed for the damage to cabinets. The Court does not find for Defendants on the following claims: (1) completion of the plumbing, as Defendants have not shown that this was not part of the work covered by the final contract payment, which Defendants did not make after Plaintiff breached; (2) "crush-in-run driveway," as the Court finds that the temporary driveway was not strictly necessary; and (3) the miscellaneous Lowes/Home Depot receipts, as the Court finds that these items were finishing touches that would have been covered by the final draw for completion of the project.

## VI. CONCLUSION

Discounting the amount the Defendants owe Plaintiff by the amount that Plaintiff owes Defendants, the Court awards judgment to Plaintiff in the amount of $2,490.80.

**IT IS SO ORDERED.**

/s/

**M. JANE BRADY**
Superior Court Judge
